UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| John Magobet,<br><br>                    Plaintiff,<br><br>vs.<br><br>Kilolo Kijakazi, Acting Commissioner of Social Security Administration,<br><br>                  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 5:21-2676-KDW<br><br><br><br><br>ORDER |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court affirms the Commissioner's decision for the reasons discussed herein.

I.      Relevant Background

      A.      Procedural History

On May 31, 2019,[1] Plaintiff protectively filed applications for DIB and SSI alleging he became disabled on February 28, 2019. Tr. 201-12. Plaintiff's applications were denied initially on October 23, 2019, Tr. 108-09, and on reconsideration on May 4, 2020, Tr. 142-43. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 165-66. ALJ Susannah Merritt conducted an administrative hearing on September 24, 2020 in Philadelphia, Pennsylvania,

---

[1] Although the application summaries are dated June 21, 2019, Tr. 201-12, the Disability Determination and Transmittals reflect a filing date of May 31, 2019, Tr. 108-09.

taking testimony from Plaintiff and Vocational Expert ("VE") Donna Mancini. Tr. 42-73. The ALJ denied Plaintiff's claim in a decision dated October 26, 2020. Tr. 10-30. On December 17, 2020, Plaintiff requested review of this decision by the Appeals Council. Tr. 196-97. After granting Plaintiff's request for additional time, Tr. 8-9, on June 16, 2021 the Appeals Council sent Plaintiff a "Notice of Appeals Council Action" indicating it had denied Plaintiff's request for review of the ALJ's October 2020 decision, thus making the ALJ's decision the final decision of the Commissioner of Social Security, Tr. 1-6. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on August 20, 2021.[2] ECF No. 1.

B.  Plaintiff's Background

Born in May 1966, Plaintiff was 52 years old on his alleged onset date of February 28, 2019. Tr. 266. In his June 21, 2019 form Disability Report-Adult Plaintiff indicated that he was 5'7" tall and weighed 242 pounds. Tr. 250. Plaintiff indicated that he stopped working on February 28, 2019 because of his medical conditions which he listed as depression, problems with both knees, diabetes, and high blood pressure. *Id.* Plaintiff indicated that he completed the 9th grade, did not attend special education classes, and had completed specialized job training in 2004 in the areas of HVAC training, 235 training,[3] and lead paint certification. Tr. 251. Plaintiff indicated his past relevant work ("PRW") consisted of the following jobs: college campus maintenance technician (Sept. 1997-Feb. 28, 2019), auto insurance processor (2005-2007), welfare job developer (2011), and college campus facility supervisor (April 2018-Sept. 2018). *Id.*

---

[2] It appears that Plaintiff now resides in South Carolina. *See* Civil Cover Sheet, ECF No. 2, indicating "Berkeley" as Plaintiff's county of residence.

[3] The Lethal Weapons Training Act 235 [of Pennsylvania] provides certification to privately employed agents to carry a lethal weapon. . . . The Lethal Weapons Training Act incorporates education and training as part of being a certified agent. *See* https://www.psp.pa.gov/lethalweapons/Pages/default.aspx (last visited Sept. 7, 2022).

In a November 7, 2019 Disability Report – Appeal, Plaintiff indicated changes in his medical conditions that occurred "Gradually." Tr. 259. Plaintiff noted that his "conditions have become more severe and cause [him] greater limitations." *Id.* He also indicated changes in his daily activities due to his medical conditions noting: "Virtually every aspect of my day and everything that I do is more difficult as a result of the conditions that I suffer from and the symptoms that they cause me[.]" Tr. 263.

C.      Administrative Proceedings

Plaintiff appeared with counsel on September 24, 2020 before ALJ Merritt for his administrative hearing. Tr. 44. VE Mancini also appeared and testified. *Id.* Due to the extraordinary circumstance of the Covid-19 Pandemic the hearing was conducted telephonically with Plaintiff's consent. Tr. 45, 194.

1.  Plaintiff's Testimony

In response to questions from the ALJ Plaintiff verified his height at 5'7" and his current weight at 272 pounds. Tr. 47. Plaintiff testified that he lived in a house with his wife and two children—a 22-year-old daughter and a 10-year-old son with autism. *Id.* Plaintiff stated that both his wife and daughter worked at night. *Id.* Plaintiff stated that "if it wasn't for COVID" his son would be in school during the day. Tr. 48. Plaintiff indicated that he usually gets around by driving, and he attended high school through the ninth grade, but did not get a GED. *Id.* Plaintiff testified that he has medical coverage through "public assistance, Health Partners" and he had not had a period where he has not had any insurance. *Id.* Plaintiff confirmed that he is no longer working, and last worked "over a year ago, last year, about March." *Id.* The ALJ noted Plaintiff's alleged onset date of February 28, 2019, and Plaintiff confirmed that date noting that he went into the hospital for surgery on March 1st. Tr. 48-49. Plaintiff testified that his last job was as a full-time

3

maintenance technician for University City student housing. Tr. 49. Plaintiff described his duties as doing preventative maintenance and repairs throughout the building. *Id.* Plaintiff affirmed that the work was mostly on his feet, and the heaviest thing he had to lift and carry was about 35 pounds and would be "a mainframe ladder or sometimes a dishwasher, if we had to replace one." Tr. 50. Plaintiff testified that before working as a maintenance technician he worked full-time around 2005-2006 doing insurance sales. *Id.* Plaintiff testified that in the past 15 years he has done maintenance work that included electrical contracting for which he "had to get certified for heating and air" and take electrical courses for certification. Tr. 51-52.

Plaintiff testified that he is unable to work because of his knees and his back. Tr. 52. Plaintiff testified that he does some physical therapy for his knees, and sometimes gets cortisone shots but they will last only for a day, then he is in more pain than he was before the shot. Tr. 52-53. Plaintiff stated that he will eventually have to do knee replacement surgery, "but that's not going to happen any time soon because, financially, [he] can't afford it, and it would take more time of [him] being out of commission, then going to rehab to get it done, and then [he would] still be in the same position [he is] right now, financially unable to take care of [him]self." Tr. 53. Plaintiff testified that his back pain was at the C4-C5, L4-L5 level and resulted from his being rear-ended in an auto accident in 2007. Tr. 53. Plaintiff stated that surgery was not an option because of decreased mobility, and that pain medication made him sick, so he takes "800 milligrams of Ibuprofen daily and deal[s] with the pain." Tr. 53-54. Plaintiff noted that he is "also a type 2 diabetic" and he is on two medications for depression. Tr. 54. Plaintiff testified that being unable to work has "put a toll on [him], mentally and physically, because [he is] unable to do things and [he is] unable to provide for [his] family." *Id.* Plaintiff testified that because of COVID he has been unable to see a mental health professional, but he went nine or ten months ago. Plaintiff

4

stated that he tried doing therapy by video or by phone but he did not get the same results, so he just takes his medicine as prescribed. Tr. 54-55. Plaintiff testified that he takes Advil three times a day, an anti-inflammatory twice a day, Zoloft, cholesterol medication, blood pressure medication, diabetes medication, and insulin. Tr. 55. Plaintiff stated that he sometimes gets dry mouth or headaches as side effects. Tr. 56. Plaintiff stated he has good days and bad days. *Id.* When asked to describe a typical day after he stopped working but pre-pandemic, Plaintiff stated that after waking he takes "a 15-minute hot shower to put heat on [his] back and [his] knees." Tr. 57. After showering he eats breakfast before he can take his medication. Plaintiff testified that it takes him "about a good ten minutes to get downstairs, because [he has] to take it step-by-step because of the pain and when [he] bend[s] [his] knees, it's excruciating." *Id.* Plaintiff stated that he tries not to sit, because once he sits, he cannot get up. He stated that he tries to walk around in the house until he can no longer stand up because of pain, then he will sit in the recliner until his wife needs to be driven to the grocery store or pharmacy. *Id.* Plaintiff stated that he normally sits in the car while his wife shops but he drives because he is the only one in the family with a driver's license. Tr. 58. He stated that his car has adjustable seats but he tries not to sit too long because his legs will get numb. *Id.* He stated that he sometimes will try to walk around the store with his wife or daughter, but at some point, he will have to sit because of pain. Tr. 59. Plaintiff testified that he tries to stay as mobile as he can—as his doctors recommend—but he is always in pain. *Id.* Plaintiff stated that his level of depression is very high because he is unable to function like he used to and he used to be very active. *Id.* Plaintiff stated that he gets very sad and cries a lot. Tr. 60. He also stated that if he misses a day or two of his medication he gets "really super-depressed" and has "suicidal intentions." Tr. 60. Plaintiff testified that he has no problems interacting with people and is "very good around people." *Id.* Plaintiff stated that he still puts in job applications but when they

5

find out about his disabilities he gets "shot down because they don't want to [hire] a 54-year-old man who can't lift . . . 50 pounds and can't stand all day." Tr. 60-61. Plaintiff stated that his ability to concentrate depends on what level of depression he is having. Tr. 61. When asked if there were places that he went on a regular basis other than the grocery store and pharmacy, Plaintiff stated that his family used to go to flea markets but they do not do that anymore because he is unable to walk the distance and has to constantly stop every 30 minutes and then rest for 30 minutes. Tr. 61-62. Plaintiff testified that at one time he weighed 300 pounds and he had to lose weight because of his diabetes. He stated that he went down to 242 pounds, but he gained 30 pounds in the last three months because of inactivity. He stated that he is "losing the weight again, slowly but surely, but it's a hard process." Tr. 62.

In response to questions from his counsel Plaintiff stated that he spends more time in bed because of depression, but when he does get up it takes him about 15 minutes "to sit up, work the circulation in [his] knees, and then get [him]self to the bathroom to get into the shower." Tr. 63. Plaintiff stated that once he gets up, he tries not to lie in bed during the day. He testified that he tries to sit in the chair and do the recommended stretches for his knees. *Id.* Plaintiff described the pain of going up and down stairs. *Id.* Plaintiff stated that he tries to keep busy by organizing his tools or filling out applications on the computer but by late afternoon he needs to take pain medication and goes back upstairs to lie down. Tr. 64. Plaintiff stated that he drives "maybe three out of seven days" for 30 minutes to an hour. *Id.*

Plaintiff stated that the pain is in both of his knees and they both hurt about the same. Tr. 65. He testified that he was put on insulin about a year ago and he takes it once a day; he takes Metformin and another diabetic medication twice a day. Tr. 65-66. Plaintiff said he discovered he had diabetes in 2008. Tr. 66. He stated that since getting diabetes his vision has gotten worse and

6

he "really can't drive too much at night anymore because [his] eyes get blurrier at night than it does during the day." *Id.* Plaintiff stated that if his A1c "gets any higher than 5.98, it gets really bad." *Id.*

### 2. VE's Testimony

The VE classified Plaintiff's PRW as maintenance repairer/building, Dictionary of Occupational Titles ("DOT") number 899.381-010, medium, SVP of 7, skilled work, 75 pounds, heavy as performed. Tr. 68. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work with the following limitations:

> Further assume that this individual is at a light exertional level. The individual can only frequently operate foot controls bilaterally. The individual can occasionally climb ladders, ropes, and scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, crawl; frequently balance. In addition, the individual can only occasionally be exposed to unprotected heights and moving mechanical parts. The individual can have occasional exposure to humidity and wetness, dust, odors, fumes, and other pulmonary irritants. The individual can only occasionally be exposed to extreme cold or extreme heat. The individual can perform simple routine and repetitive tasks, make simple work-related decisions, and tolerate occasional changes in work setting. In addition, this individual would need to be able to change position on an hourly basis but would be able to remain on task while doing so.

Tr. 68-69. The ALJ asked if an individual with those limitations could perform Plaintiff's past work and the VE responded that "past work would be eliminated." Tr. 69. The VE testified that other work would be available and identified the following examples: marker, DOT number 209.587-034, light, SVP of 2, unskilled, 309,645 positions in the U.S. economy; router, DOT number 222.587-038, light, SVP of 2, unskilled, 53,187 positions in the U.S. economy; and collator operator, DOT number 208.685-010, light, SVP of 2, unskilled, 12,849 positions in the U.S. economy. Tr. 69. The VE testified that her testimony was consistent with the DOT "with the exception of the sit/stand option, as the DOT does not address a sit/stand option[.]" *Id.* The VE stated her testimony was "based upon contact with employers and seeing how positions are

performed, now with the use of chairs and stools, range of headsets and workstations that could be raised and lowered." Tr. 70.

For her second hypothetical the ALJ kept the previous restrictions but placed the individual at the sedentary exertional level. Tr. 70. The ALJ asked if there would be any transferable skills from past work and the VE testified there was "no transferability from past work to sedentary work." Tr. 70. The VE again affirmed that her testimony was consistent with the DOT. *Id.*

Plaintiff's counsel asked the VE if she considered herself an expert in statistics or actuary sciences. Tr. 70. She replied that although she has "taken courses in statistics in the course of [her] Master's program" she would not consider herself a statistician. *Id.* Counsel asked what sources she used to provide the job numbers for the positions she identified and the VE stated she used a program that extracts information from the Department of Labor Bureau of Labor Statistics. Tr. 71. The VE testified the numbers are for full-time positions and she did not have to reduce the numbers based on the hypothetical. *Id.* The VE testified that she no longer places people in jobs as part of her professional activities and she stopped doing placement work five or six years ago. *Id.* The VE did not recall the last time she observed the three positions she identified in response to the ALJ's hypothetical. Tr. 72.

Plaintiff's counsel had no more questions for the VE but noted for the record that she was objecting to the numbers provided because she did not "believe that there's a way to accurately estimate these job numbers by DOT title or DOT code, and therefore, . . . it should not be considered substantial evidence." Tr. 72. Counsel indicated she would be submitting a brief on the topic and asked for time for the submission. The ALJ indicated it would be fine if the brief came in before her decision, but she was "not going to hold up a Decision in this case for a brief like that." *Id.* With nothing further, the hearing closed. Tr. 73.

8

II. Discussion

    A.    The ALJ's Findings

In her October 26, 2020 decision, the ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2024.
>
> 2. The claimant has not engaged in substantial gainful activity since February 28, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: lumbar spondylosis, lumbar degenerative disc disease, cervical straightening, diabetes mellitus, hypertension, osteoarthritis of the bilateral knees, status post right knee meniscus tear repair, depression, anxiety/panic disorder, and obesity (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can operate foot controls frequently bilaterally; he can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; he can frequently balance, but can only occasionally stoop, kneel, crouch, and crawl; he can occasionally be exposed to unprotected heights and moving mechanical parts; he can only have occasional exposure to humidity, wetness, extreme cold, extreme heat, dust, odors, fumes, and other pulmonary irritants; he can perform simple, routine, and repetitive tasks; he can make simple work-related decisions; he can tolerate occasional changes in the work setting; and he needs to be able to change position hourly, but can remain on task while doing so.
>
> 6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

> 7. The claimant was born on May 15, 1966 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
>
> 8. The claimant has limited education (20 CFR 404.1564 and 416.964)).
>
> 9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 15, 17, 20, 28, 30.

   B.   Legal Framework

      1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five

sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he/she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party. . . ." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650,

12

653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.   Analysis

Plaintiff argues that the "ALJ's RFC determination is unsupported by substantial evidence as she failed to properly evaluate the opinion of treating physician, John Traverso, D.O." Pl.'s Br. 1, ECF No. 12.

A.  Evaluation of Opinion Evidence

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or give special deference to treating source opinions. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical

13

finding(s), including those from [a claimant's] medical sources").[5] Instead, ALJs consider medical opinions using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with the other evidence in the claim or understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion, and the ALJ is not required to explain the consideration of the other three factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The new regulations further deem certain evidence "inherently neither valuable nor persuasive." 20 C.F.R. §§ 404.1520b(c), 416.920b(c). This includes statements on issues reserved to the Commissioner such as whether a claimant is disabled, is unable to work, or is incapable of doing past relevant work. 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3).

1. Dr. John Traverso's Opinion

On September 18, 2020, Dr. Traverso completed a Treating Source Statement – Physical Conditions questionnaire regarding Plaintiff. Tr. 1129-1132. He noted that Plaintiff had been a patient with his practice since November 8, 2010. Tr. 1129. Dr. Traverso indicated that in a typical workday, Plaintiff's symptoms would likely be severe enough to interfere with his attention and concentration causing him to be off task more than 25%; Plaintiff could maintain attention and

---

[5] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5).

concentration for less than five minutes before needing a break; and Plaintiff would, on average, be absent four or more days per month due to his impairments and/or treatment. Tr. 1129. Dr. Traverso opined that Plaintiff could rarely lift or carry less than ten pounds, and never lift or carry anything over ten pounds. Tr. 1130. He based this assessment on an x-ray and "mild spondylosis at L5-S1." *Id.* He noted, on average, Plaintiff could sit, stand, and walk for less than one hour each in an eight-hour work day, and he would require an option to sit/stand at will. *Id.* Dr. Traverso based this finding on "back pain moderate throbbing." Tr. 1130. He noted that during an eight-hour workday Plaintiff would need to lie down or recline for 30 minutes every hour. *Id.* He indicated Plaintiff would not need to elevate his legs, nor would he require the use of an assistive device. *Id.* Dr. Traverso indicated Plaintiff could reach overhead, reach in all other directions, handle, finger, and feel continuously with both arms/hands; but he could never bilaterally push/pull noting that "pushing/pulling interferes with back pain." Tr. 1131. He indicated Plaintiff could use foot controls continuously bilaterally. *Id.* Dr. Traverso indicated Plaintiff could never climb stairs and ramps, climb ladders and scaffolds, balance, stoop, kneel, or crouch; but he could continuously rotate his head and neck. Tr. 1132. He noted this assessment was based on a finding that Plaintiff's back pain was worse with range of motion. *Id.* As for environmental limitations, Dr. Traverso indicated Plaintiff could never be exposed to unprotected heights or moving mechanical parts, but he could continuously operate a vehicle, and continuously be exposed to humidity and wetness, dust/odors/fumes/pulmonary irritants, extreme cold, extreme heat, and vibrations. *Id.*

2. The ALJ's Consideration of Dr. Traverso's Opinion

The ALJ considered Dr. Traverso's medical opinion noting that he was Plaintiff's family medicine provider. Tr. 27. After outlining the conclusions made in the Treating Source Statement, the ALJ made the following determination:

15

> The undersigned does not find this opinion persuasive, as it is not supported by or consistent with the record as a whole. Dr. Traverso greatly overstates the degree of the claimant's limitations in light of the objective evidence of record. The updated diagnostic imaging of the claimant's lumbar spine and knees from June 2020 does not support such significant limitations. Moreover, Dr. Traverso's treatment records generally revealed normal concentration, attention, range of motion, strength, and sensation. (Ex. 15F at 14, 22, 42, 51, 60; Ex. 19F at 33).

Tr. 27.

### 3. Discussion

Plaintiff asserts the ALJ's findings are "inadequate because the ALJ failed to consider the totality of the medical evidence." Pl.'s Br. 10. Plaintiff contends that Dr. Traverso's assessed limitations are supported by the findings of consultative examiner David B. Klebanoff, M.D.; x-rays of Plaintiff's knees and lumbar spine; and treatment records of Jeffrey Malumed, M.D. *Id.* at 11. Plaintiff argues that "the ALJ failed to articulate how she considered these probative findings." *Id.* at 12. Plaintiff also argues the ALJ "cherry-picked the evidence of record" noting that she failed to take into consideration his "treating history with the medical offices of Dr. Fanning and Dr. Traverso dating back to November of 2010 with consistent reports of chronic knee pain." *Id.* at 12-13. The Commissioner argues that within her decision the ALJ "sufficiently discussed her consideration of the evidence to give insight into her thought process and allow for meaningful judicial review." Def.'s Br. 8, ECF No. 13. The Commissioner further argues that the ALJ followed the regulations when assessing the persuasiveness of Dr. Traverso's opinion and substantial evidence supports the ALJ's fact-finding. *Id.* at 11.

The ALJ thoroughly discussed the objective evidence of record—including all of the records cited by Plaintiff in his brief. Tr. 21-24. The ALJ noted that Dr. Klebanoff "overstates the claimant's ability to lift in light of the updated imaging of the claimant's lumbar spine from June 2020. Conversely, he understates the claimant's ability to stand and/or walk." Tr. 27. The ALJ also cited to the "updated imaging of the claimant's knees, which revealed only mild left medial

compartment osteoarthritis and a small right suprapatellar joint effusion. (Ex. 19F at 15)." *Id.* The ALJ noted Plaintiff's "longstanding history of bilateral knee pain" when discussing the March 2018 treatment records of Dr. Malumed. Tr. 21. The ALJ indicated that although "[p]hysical examination findings revealed some pain over the medial joint lines, moderate patellofemoral crepitus, and pain on compression . . . they also revealed full and complete range of motion, no swelling, negative flexion McMurray sign, no ligamentous laxity, no effusion, and no erythema. (Ex. 16F at 2)."[6] *Id.* The ALJ also noted Dr. Malumed's treatment of Plaintiff with injections, medication, and knee braces. *Id.* Additionally, in making her findings regarding Dr. Traverso's opinion, the ALJ cites to the diagnostic imaging of Plaintiff's back and knees, and to treatment records of Dr. Traverso and Dr. Fanning regarding their findings of "normal concentration, attention, range of motion, strength, and sensation." Tr. 27 (citing Exs. 15F and 19F).

In reviewing the ALJ's decision, the undersigned finds that the ALJ adequately reviewed and considered the medical opinion of Dr. Traverso, including as it pertains to supportability and consistency. For example, it is clear to the undersigned that the ALJ determined that Dr. Traverso's opinion, which reflects an inability on the part of Plaintiff to maintain concentration and attention and to perform a variety of postural movements, is unsupported by his own medical findings, as well as the objective medical evidence of record. Tr. 27.

The issue here is whether the ALJ's decision is supported by substantial evidence, not whether a different conclusion could be supportable. The responsibility for weighing evidence falls on the Commissioner, not the reviewing court. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "An ALJ's determination as to the weight to be assigned to a medical opinion will generally

---

[6] In his brief Plaintiff cited to Dr. Malumed's report at transcript page 463, which is Exhibit 7. In her decision the ALJ cited to Exhibit 16 which is a duplicate of Exhibit 7.

17

not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has not given good reason for the weight afforded a particular opinion." *Koonce v. Apfel*, 166 F.3d 1209 (4th Cir. 1999) (per curiam) (unpublished) (internal citation & quotation omitted); *see also* 20 C.F.R. § 404.1527(d)(2), § 416.927(d)(2). In undertaking review of the ALJ's treatment of a claimant's medical sources, the court focuses its review on whether the ALJ's decision is supported by substantial evidence.

It is well-settled that an ALJ "'must build an accurate and logical bridge from the evidence to his conclusion.'" *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Here, it is clear from the ALJ's discussion that she considered the evidence of record that supported her findings regarding Dr. Traverso's opinion. The ALJ's analysis comports with the regulations as she properly considered the supportability and the consistency of the opinions of Dr. Traverso and provided an adequate explanation for why she found the opinion unpersuasive. Accordingly, the court finds the ALJ's evaluation of the opinion evidence is in keeping with the revised regulations and is supported by substantial evidence.

IV.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig,* 76 F.3d 585, 589 (4th Cir. 1996); *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

September 26, 2022  
Florence, South Carolina

Kaymani D. West  
United States Magistrate Judge